**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
E-mail: dalekgalipo@yahoo.com
Hang D. Le (SBN 293450)
E-mail: hlee@galipolaw.com
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333; Fax: (818) 347-4118

**LAW OFFICE OF SHARON J. BRUNNER**
Sharon J. Brunner, Esq. (SBN 229931)
Email: sharonjbrunner@yahoo.com
14393 Park Avenue, Suite 100
Victorville, CA 92392
Tel: (760) 243-9997; Fax: (760) 843-8155

**LAW OFFICE OF JAMES S. TERRELL**
James S. Terrell, Esq. (SBN 170409)
Email: jim@talktoterrell.com
15411 Anacapa Road
Victorville, CA 92392
Tel: (760) 951-5850; Fax: (760) 952-1085

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEVON KING,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>CITY OF FONTANA; CHRIS TUSANT; and DOES 1-10, inclusive,<br><br>　　　　　Defendants. | Case No. 5:20-cv-01071 ODW (SHKx)<br><br>*Honorable Otis D. Wright, II*<br>*Mag. Judge Shashi H. Kewalramani*<br><br>**DECLARATION OF JEFFREY NOBLE IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

DECLARATION OF JEFFREY NOBLE

I, Jeffrey Noble, hereby declare as follows:

1. I am a police practices expert specializing in the procedures of police practices and proper police tactics, including proper procedures for detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2. I am a competent adult and am personally familiar with the facts contained herein and could competently testify thereto if called upon to do so.

3. I was retained in this action to render opinions regarding the incident that occurred on May 11, 2019 that resulted in the officer-involved shooting of Devon King.

4. The opinions I formed are made within a reasonable degree of certainty within the field of police practices based on over 35 years of professional law enforcement experience and scholarship.

5. I was a police officer for 28 years. I retired in July 2012 as the Deputy Chief of Police with the Irvine Police Department. As a Deputy Chief, I was directly responsible for all police operations including Patrol, Traffic, Criminal Investigations, Emergency Management, Crime Prevention, DARE, K9s, Training, and SWAT. The City of Irvine encompasses over 70 square miles with a population of over 218,000. I served in a wide range of assignments as an Officer, Senior Officer, Sergeant, Lieutenant, Commander and Deputy Chief, including Patrol, Traffic, Detective, SWAT, Training, Internal Affairs, Emergency Management and Crime Prevention. The Irvine Police Department had over 200 police officers and over 100 civilian employees during my employment with the department.

6. In April 2014, I was hired by the Westminster, California Police Department as an interim Deputy Chief of Police. My employment with the Westminster Police Department was by means of a temporary contract, and I was asked to review the department's Internal Affairs unit; department policies relating to Internal Affairs investigations, discipline and police officer conduct; conduct

department audits and inspections; and act as a liaison with a civilian oversight monitor who was hired during the same period. My employment was at the request of the Chief of Police, was ratified by the City Council and was sought due to the arrest of a police officer for an off-duty criminal sexual assault, the arrest of an on-duty officer for extortion and a lawsuit filed by three Latino officers alleging discrimination and retaliation. I concluded this interim position in January 2015. The Westminster Police Department had 87 police officers and 40 civilian employees during my temporary contracted employment.

7. As a police supervisor and manager, I have extensive experience conducting internal administrative investigations on a wide range of issues including use of force, vehicle pursuits, officer misconduct, criminal interrogations and interviews, harassment and sexual assaults.

8. My areas of expertise in policing include, but are not limited to: police use of force; pursuits; police administration; training; police operations; criminal investigations; interviews and interrogations; civil rights violations and investigations; internal/administrative investigations; criminal investigations; police discipline; citizen complaints; and police policies and procedures.

9. In forming my opinions, I reviewed the following documents: (1) Complaint; (2) Photographs of Sergeant Tusant; (3) Scene Photographs; (4) Deposition of Devon King; (5) Deposition of Officer Joshua Patty and exhibits thereto; (6) Deposition of Sergeant Christopher Tusant and exhibits thereto; (7) Police Report of the incident; (8) Audio Recordings of radio traffic and 911 calls; (9) Officer Patty Bodycam video; (10) Sergeant Tusant Bodycam video; (11) Power Point of frame by frame screen shots of Sergeant Tusant Bodycam video.

10. The opinions I formed are made within a reasonable degree of certainty within the field of police practices based on over 35 years of professional law enforcement experience and scholarship.

11. It is well-recognized that an officer's use-of-force decisions (that is, whether, when, and how to use force) are predicated to a significant degree on events that occurred prior to the use of force itself. In most incidents, including the interaction in this case, an officer's use of force is the result of "a contingent sequence of decisions and resulting behaviors—each increasing or decreasing the probability of an eventual use of . . . force." Put differently, "[a]n officer's use-of-force decision . . . will almost always be affected by events that occur prior to the use of force itself, and often prior to the subject's noncompliance, resistance, or other physical actions upon which the use of force is immediately predicated." It follows that the use of force cannot be properly evaluated without considering the preceding actions of officers, subjects, or bystanders.

12. Any reasonable officer in the circumstances confront Sergeant Tusant and Officer Patty would have conducted a high-risk car stop for the safety of the officers, the community and the people inside the vehicle.

   a. High-risk pullovers are conducted in any situation where patrol officers perceive a greater level of risk. Such perceptions may be based on the officer's observations, information received through communications with dispatch, other officers, or other reliable means.

   b. High-risk pullovers are generally made when patrol officers have reason to believe that one or more of the occupants of the target vehicle may: be armed, represent a serious threat to the officer, or has committed a felony.

   c. Sergeant Tusant and Officer Patty were part of a team that was conducting surveillance on party attendees that night in connection with a shooting that occurred on the prior night.

   d. Sergeant Tusant and Officer Patty had received information from Officer Drayer over the radio that two subjects were seen with a

handgun before entering a red vehicle that subsequently left the area.

 e. Sergeant Tusant and Officer Patty were aware that there were four occupants inside the red vehicle. They further claimed to have observed the subjects acting in a suspicious manner and believed there was a handgun inside the vehicle.

13. In a high-risk pullover, police officers are trained to:

 a. Responding to a call involving a crime in progress is one of several high-risk duties' peace officers must perform. Reverence for human life is the guiding principle when responding to crimes in progress.

 b. No arrest is so important that the patrol officers involved should expose themselves to needless danger. In order to meet the safety challenges inherent to the situation, patrol officers must employ tactically sound procedures when effecting any high-risk vehicle pullover.

 c. Request sufficient personnel and equipment to perform any necessary actions safely and effectively and achieve a psychological advantage over the vehicle's occupants.

 d. Use marked patrol vehicles to affect the vehicle pullover, if possible, to prevent recognition problems and to ensure necessary equipment is available within the vehicle.

 e. Use available cover and concealment.

 f. Maintain visual contact with vehicle occupant(s) at all times.

 g. Always maintain a position of advantage.

 h. Do not rush.

 i. Guard against becoming impatient. (Time is usually on the officer's side.)

 j. Wait for requested backup/assistance to arrive before taking action.

14. Any reasonable police officer in these circumstances would have used high-risk car stop tactics and maintained a position of cover as they conducted their investigation. Instead, Officer Patty and Sergeant Tusant abandoned their cover by walking up to the vehicle and contacting the occupants and they failed to request additional officers even though they believed there was a handgun in the vehicle, that the passengers were acting suspiciously by making furtive movements as the car was coming to a stop, and that they believed the driver was frightened or distracted by events inside the vehicle as he struck the curb upon coming to a stop.

15. There is no evidence that any member of the team that was involved in conducting the surveillance were unavailable to assist on this high-risk stop.

16. Police officers are trained that it may be inadvisable for officers to engage in a foot pursuit of any fleeing suspect(s) during a high-risk pullover. Taking such action may draw officer(s) into potentially unsafe (uncleared) areas and compromise the safety of officer(s). Rather than initiating the foot pursuit, officers should consider establishing a perimeter of the area and initiating a systematic search of the area.

17. Here, Sergeant Tusant knew that Officer Patty had just directed Mr. Jackson to exit the vehicle and that Mr. Stewart and Mr. Harrod were in the backseat. Sergeant Tusant knew that none of the subjects had been secured and that it would be unlikely that Officer Patty would be able to assist him should he catch Mr. King.

18. The failure of the officers to follow their training and generally accepted police practices by failing to employ high-risk car stop tactics, to maintain a position of cover and to wait for additional officers, and Sergeant Tusant's reckless decision by engaging in a foot pursuit of Mr. King when he knew he was by himself, that Officer Patty would unlikely be able to assist and that follow up officers were not requested, created the danger that led to Sergeant Tusant's use of deadly force.

19. Police officers are trained that in order to justify the use of deadly force, there needs to be an immediate threat of death or serious bodily injury to the officer or others.

20. Sergeant Tusant's body worn camera captured the moment of the shooting. Mr. King can be seen running away from Sergeant Tusant. The video does not show any movement of Mr. King as though he were turning to face Sergeant Tusant or that he was raising his arms in a threatening manner.

21. Mr. King was not armed when he was shot as he had dropped the handgun when he fell the second time. The handgun was located after the shooting in the gutter near Sergeant Tusant's feet. Sergeant Tusant said he did not see the gun in the gutter until after the shooting.

22. Here, Sergeant Tusant said he did not see Mr. King in possession of the handgun when he fired four times at Mr. King. In fact, Mr. King was not armed at the moment of the shooting. Sergeant Tusant's body worn camera video shows Mr. King running away, but it does not show Mr. King making a turning movement. Instead, Mr. King's back is to Sergeant Tusant as Mr. King flees that would cause a reasonable police officer to believe they were at imminent risk of death of serious bodily injury.

23. Absent an imminent threat of death or serious bodily injury, the use of deadly force by Sergeant Tusant was objectively unreasonable and inconsistent with generally accepted police practices.

I declare under penalty of perjury that the foregoing is true and correct, and that this was executed this 13 day of November 2020 at Rancho Santa Margarita, CA

Jeffrey Noble